IN THE COURT 
OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,574




CHRIS WAYNE SHUFFIELD, Appellant

v.


THE STATE OF TEXAS





ON DIRECT APPEAL

FROM BOWIE COUNTY




Price, 
J., delivered the 
opinion of the Court, in which Meyers, 
Womack, 
Johnson, 
Holcomb, and 
Cochran, JJ., joined. 
Keller, 
P.J. concurred in the 
result. Hervey, J., 
filed a 
concurring opinion, in which 
Meyers and Keasler, 
JJ., 
joined. 

O P I N I O N

In February 2003, 
a jury convicted the appellant of a capital murder. (1) Pursuant to 
the jury's answers to the special issues set forth in Texas Code of Criminal 
Procedure Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced the 
appellant to death. 
(2) Direct appeal to this Court is automatic. (3) The 
appellant raises seven points of error. We shall affirm.
I. 
Facts
The State 
indicted the appellant for causing the death of Lance Walker while in the course 
of committing or attempting to commit the offense of robbery. The appellant and 
his brother Billy went over to Walker's house, where they drank beer, smoked 
marijuana, and played darts. At some point, the appellant picked up a shotgun 
and shot Walker. With his brother's help, the appellant then took some items 
from the house, including money, guns, and Walker's truck. In a statement he 
later gave to police, the appellant admitted that he had told Billy on the way 
to Walker's house that he had been thinking about "sticking someone up and 
taking their vehicle." The appellant told police that he had planned to kill the 
person for the vehicle and that Billy agreed to help.
II. 
Jury Selection
In his fourth and 
fifth points of error, the appellant asserts that the trial court erred in 
ruling that he failed to make a prima facie 
showing that the State had exercised its peremptory strikes with a 
discriminatory purpose against four venire members. (4) After an 
initial review of the claim, we abated this appeal for a hearing regarding the 
State's use of its peremptory strikes against venire members Seymour, Drake, 
Nelson, and Talton. 
(5) 
A Batson challenge 
generally gives rise to a three-step process. First, the defendant must make a 
prima facie case that a venire member was peremptorily excluded on the 
basis of race. 
(6) Next, the prosecution must come forward with race-neutral reasons 
for the peremptory strike. (7) Finally, the defendant has the opportunity 
to rebut the State's explanations. (8) The burden 
of persuasion remains with the defendant to prove purposeful discrimination. (9) In 
Purkett v. Elem, the United States Supreme Court explained that "unless 
a discriminatory intent is inherent in the prosecutor's explanation, the reason 
offered will be deemed race neutral." (10) 

At the hearing, the lead trial 
prosecutor explained why the State had struck each of the four complained-of 
venire members. The second prosecutor echoed the lead prosecutor's reasons and 
added some of her own recollections. Specifically, the prosecutors gave the 
following reasons for striking the venire members:
Seymour - was young, had a prior 
conviction for driving while intoxicated (DWI) and a prior conviction for 
possessing marijuana, felt he had been mistreated during the DWI because his 
license was suspended, held a grudge against one of the officers involved in the 
DWI because he felt the officer did not treat him right, was single, had no 
children, and vacillated regarding his personal feelings regarding the death 
penalty. The prosecutor explained that he had a practice of not allowing persons 
with convictions to sit on his juries, and the State was looking for parents 
because the victim was an adult child with "special problems" who was living 
alone. Co-counsel added that she was not sure that he was being completely 
honest about his criminal background.

Drake - did not believe in the death 
penalty but could assess it in the proper case, could not think of anything he 
thought was mitigating except possibly drug and alcohol abuse, appeared 
predisposed towards a life sentence if he thought the victim had any 
responsibility in the altercation. The prosecutor explained that he thought part 
of the defense theory was that the appellant was a drug addict who was high at 
the time of the offense. Co-counsel remembered that Drake talked about needing 
to find premeditation before he could find someone guilty of capital murder. 

Nelson - her son was sent to prison 
for three years eight days before trial, circled two answers on her 
questionnaire regarding her beliefs generally opposing the death penalty, worked 
in the pharmacy of the Telford Unit and knew many of the inmates in the maximum 
security unit but did not believe that most of them would be future dangers, and 
constantly commented that she would need proof "beyond a shadow of a doubt" in 
order to find a person guilty of capital murder. Co-counsel remembered that 
Nelson had commented that evidence regarding sexual abuse of the defendant would 
have weighed heavily in mitigation, and co-counsel was certain that the 
appellant intended to raise such evidence.
Talton - generally stated that he did 
not believe in and would not assess the death penalty, but equivocated and 
vacillated enough to defeat a challenge for cause. 
None of the prosecutors' 
explanations reflect an inherently discriminatory intent. The appellant 
attempted to rebut the State's reasons with statistical calculations and a 
comparison with other jurors. In his comparative analyses, the appellant 
discussed the allegedly disparate treatment of venire members who shared only 
one isolated issue or view in common with a struck venire member. The appellant 
did not raise or discuss any disparate treatment of any venire member who shared 
a combination of reasons. The trial court found that the State's explanations 
were race neutral and not pretexts for racial strikes. The trial court's 
findings are supported by the record and are not clearly erroneous. Points of 
error four and five are overruled. 
In his sixth point of error, the 
appellant claims that the trial court erred in releasing members based upon 
unsworn excuses. He asserts that Texas Government Code Section 62.110 allows a 
trial court to release venire members based upon a reasonable sworn excuse. In 
his brief, the appellant complains only about the excusing of venire member 
McElroy. Because the record shows that the appellant expressly stated that he 
had no objection to the court's excusing McElroy, he has waived any error on 
this point. 
(11) Point of error six is overruled.
II. Evidentiary 
Issues
In his first point of error, the 
appellant claims that the trial court erred in admitting gruesome, close-up 
photographs of the victim's corpse because the photographs were "irrelevant and 
unfairly prejudicial in light of the defense's decision not to refute the 
victim's cause of death." (12) The 
appellant asserts that the photographs were rendered unnecessary because the 
issue of the cause of the victim's death was presented by other evidence and was 
not in dispute. The appellant specifically complains about State's Exhibits 
19-22, 24-25, 27-29, and 66-68.
The admissibility of a photograph 
is within the sound discretion of the trial judge. (13) Texas 
Rule of Evidence 401 defines relevant evidence as "evidence having any tendency 
to make the existence of any fact that is of consequence to the determination of 
the action more probable or less probable than it would be without the 
evidence." The photographs showed the location of the body at the crime scene 
and the wounds that caused the victim's death. Therefore, the photographs were 
relevant during the guilt phase of the trial. The fact that the jury had also 
heard testimony regarding the injuries depicted does not necessarily reduce the 
relevance of the visual depiction. 
Rule 403 allows for the exclusion 
of otherwise relevant evidence when its probative value "is substantially 
outweighed by the danger of unfair prejudice, confusion of the issues, or 
misleading the jury, or by considerations of undue delay, or needless 
presentation of cumulative evidence." Rule 403 favors the admission of relevant 
evidence and carries a presumption that relevant evidence will be more probative 
than prejudicial. 
(14) We have said 
that a Rule 403 analysis should include, but is not limited to, the following 
factors:
(1) how probative the evidence 
is;
(2) the potential of the evidence 
to impress the jury in some irrational, but nevertheless indelible 
way;
(3) the time the proponent needs 
to develop the evidence; and
(4) the proponent's need for the 
evidence. 
(15)
The reviewing 
court should, using an abuse of discretion standard, "do more than decide 
whether the trial judge did in fact conduct the required balancing between 
probative and prejudicial values; 'the trial court's determination must be 
reasonable in view of all relevant facts.'" 
(16)
In the context of 
the trial court's admitting a photograph, we should consider: the number of 
photographs, the size of the photograph, whether it is in color or black and 
white, the detail shown in the photograph, whether the photograph is gruesome, 
whether the body is naked or clothed, and whether the body has been altered 
since the crime in some way that might enhance the gruesomeness of the 
photograph to the appellant's detriment. 
(17) 
State's Exhibits 
19-22, 24-25, and 27-29 were identified by Bill Eubanks, the crime-scene 
detective who had taken the photographs. Eubanks testified that the photographs 
accurately depicted the scene of the crime as he found it. The photos in the 
record are three-and-one-half inches by five inches and black and white. We will 
assume, however, that these photos were shown to the jury in color. 
State's exhibits 
19 and 21 show a fairly broad view of the room with Walker's fully clothed body 
laying behind the sofa where it was found. State's exhibits 20, 22, 24 and 25 
are taken from different angles and show a closer view of the body and wounds. 
None of these photographs are especially detailed, and they are no more gruesome 
than the crime scene itself as it was found by the police. 
State's Exhibits 
27-29 are more gruesome than the other photographs in that they show close-up 
shots of the damage that the shotgun blast did to the victim's head and face. 
However, these photographs show only the injuries that the victim received and 
are no more gruesome than would be expected.
Finally, State's 
Exhibits 66-68 appear to be autopsy photographs depicting close-up views of the 
wounds to Walker's head after the blood has been cleaned off and a short ruler 
placed near the wound to show the size of the injuries. Except for the ruler, 
these photographs show only the injuries that the victim received and are no 
more gruesome than would be expected.
The photographs 
in question were probative of the crime scene and the injuries received by the 
victim, were necessary for the State in developing its case, and, because they 
were not overly gruesome, the photographs did not pose the potential of 
impressing the jury in some irrational way. The trial court did not abuse its 
discretion in admitting these photographs, as the danger of unfair prejudice did 
not substantially outweigh the probative value of the photographs. Point of error one is 
overruled.
The appellant 
complains in his second and third points of error that a police officer's 
testimony that the appellant's brother Billy's statement was consistent with the 
appellant's own statement amounted to inadmissible hearsay and violated his 
confrontation rights under the United States and Texas Constitutions. 
Because the 
appellant provides argument and authority under only the United States 
Constitution, he has forfeited consideration of these points of error under the 
Texas Constitution. (18) To 
consider the appellant's remaining claims, we must examine the questioned 
testimony and its context.
After opening 
statements, the State called Sheriff James Prince to testify. Prince testified 
about his response to the 911 call to this offense and the circumstances of the 
appellant's arrest. Prince told the jury that, after the appellant was 
forcefully removed from his house, an officer read him his Miranda warnings, 
(19) and he was 
taken to the hospital to receive attention for minor injuries he suffered in the 
altercation. Prince testified that, later that evening, the police again read 
the appellant his rights, after which the appellant waived his rights and gave a 
written statement. Without discussing the contents of the appellant's statement, 
the prosecutor passed the witness.
On 
cross-examination, the appellant questioned Prince about the taking of the 
appellant's confession. Prince conceded that the appellant had made some 
comments that were not included in his written confession. The appellant then 
asked Prince whether there were any "statements made to you that were 
inconsistent with what is in that [written] statement?" Prince replied that 
there were not. Apparently attempting to impeach Prince's credibility, the 
appellant then offered a statement made by another witness in which the witness 
stated that he observed the appellant making a statement to Prince that was 
inconsistent with the statement the appellant ultimately signed. The trial court 
sustained the State's objection that the offer was "a back-door attempt to try 
[to] get in self-serving hearsay." 
The appellant 
next asked Prince whether, in his experience, suspects had ever lied to him, and 
he explored with Prince various reasons why a suspect might lie. The questions 
the appellant asked implied that, while there was no dispute that the appellant 
killed Walker, the statement that he killed him to get his truck was actually 
fabricated by the officers questioning him to raise the offense from murder to 
capital murder. In fact, throughout the cross-examination, the appellant 
attempted to develop his defensive theory that the murder was the result of an 
altercation and not for the purpose of facilitating a theft as suggested by 
Prince, making the appellant guilty of murder only and not capital murder. The 
appellant continued his attempt to develop this defensive theory during further 
cross-examination:
[DEFENSE 
COUNSEL:] Did you see any inconsistencies in [the appellant's] statement itself, 
that just didn't seem to make sense to you?
[PRINCE:] No, 
sir.
Q: I mean did you 
ever investigate any further after you got that statement to see if there might 
have been some other circumstances or inconsistencies with what [the appellant] 
told you?
A: We talked with 
his brother [Billy]. We found evidence, and we took a written statement from 
him, typed statement later.
Q: Did you see 
any internal inconsistencies - internal inconsistencies in the statement itself? 
For instance, the statement says that there was a shot to the head that was the 
first shot. Okay? And the essential statement is that this was done in the 
course of planning and carrying out an intentional robbery to rob his truck. But 
then the statement says that when the shot occurred, that [the appellant] ran 
out and grabbed a rag and tried to stop the bleeding in the head. Don't you find 
that inconsistent?
A: I don't know 
what was going through his mind at that particular time. 
On re-direct, the 
prosecutor rebutted the appellant's defensive theory that the murder had not 
been committed in order to facilitate stealing Walker's truck. Specifically, the 
following occurred:
[PROSECUTOR:] 
[The appellant] gave you the statement. He gave you and Captain Pappas a written 
statement . . . of what had happened, why it happened, and what was going 
on.
[PRINCE:] Yes, 
sir.
Q: And at the 
time he gave you that statement, you say he was calm, cool and 
collected?
A: Yes, 
sir.
Q: Okay. Now you 
were asked if you went out and investigated anything else. When the defendant 
gave you that statement, did he give you any information that suggested to you 
that you needed to go find out some other motive for this murder?
A: No, 
sir.
Q: When you 
talked to the defendant, had you already talked to his brother?
A: Yes, 
sir.

* * *

Q: And when you 
talked to [the appellant's] brother, you took a written statement from 
him.
A: One of my 
investigators did, yes, sir.
Q: And you were 
present during that?
A: Yes, 
sir.

Q: And then it 
was some hours later, almost two hours later if my memory is correct, that you 
actually took a statement from the defendant.

A: Yes, sir, 
after we completed with his brother.

Q: Then you and 
your officers continued your investigation, did you not?

A: Yes, 
sir.

Q: You found 
additional property.

A: Yes, 
sir.
Q: You located 
additional witnesses and people who may have had information.

A: My 
investigator did. Yes, sir.

Q: Did you or 
your investigators find anything inconsistent with what the defendant had told 
you and Captain Pappas happened to Lance Walker?

A: No, 
sir.

Q: Did his 
brother not make a very consistent statement as to what happened to Lance Walker 
and why?[ 
(20)]

A: Yes, 
sir.

[DEFENSE 
COUNSEL]: Your Honor, we're going to object to this as hearsay.

Q: I believe the 
defense has opened the door, Judge.
[DEFENSE 
COUNSEL]: We have had no opportunity to cross-examine this witness. It's purely 
hearsay, and it's a violation of my client's Constitutional rights to confront 
witnesses.
THE COURT: 
Overruled.
Q: And you took 
his statement before you took the defendant's statement.

A: That's 
correct, the written statement.

Q: When the 
defendant gave you his statement, was it consistent with what his brother had 
told you?

A: Yes, sir. 

Hearsay is "a 
statement, other than one made by the declarant while testifying at the trial or 
hearing, offered in evidence to prove the truth of the matter asserted." (21) Hearsay 
is inadmissible unless expressly authorized by statutes or rules. (22) Because 
the State did not introduce the substance of Billy's statement, we do not know 
its precise content. However, Prince's testimony that Billy's statement was 
consistent with the appellant's statement as to what happened and 
why 
implies its content. Furthermore, the State offered the complained-of comment to 
rebut the appellant's implication that part of the appellant's statement was 
fabricated. The comment supported the State's position that the information in 
the appellant's statement was in fact true. Because of this implication, and 
because the parties treated the testimony as hearsay, we will assume without 
deciding that the testimony was hearsay. 
(23)
In addition to 
the rules generally prohibiting hearsay, in all criminal prosecutions the 
accused has a right, guaranteed by the Sixth and Fourteenth Amendments to the 
United States Constitution, "to be confronted with the witnesses against him." (24) Even when 
hearsay is properly admitted against a criminal defendant under evidentiary 
rules, the evidence implicates the Confrontation Clause of the Sixth Amendment 
because the defendant is not afforded the opportunity to confront the 
out-of-court declarant. (25) 
Recognizing 
that hearsay can be of different character, the United States Supreme Court 
recently held in Crawford v. 
Washington that "[w]here testimonial statements are at issue, the only 
indicium of reliability sufficient to satisfy constitutional demands is the one 
the Constitution actually prescribes: Confrontation." (26) 
Although the 
Supreme Court declined to spell out a comprehensive definition of what 
constitutes "testimonial" evidence, it 
stated that the term "applies at a minimum to prior testimony at a preliminary 
hearing, before a grand jury, or at a former trial; and to police 
interrogations." (27) 

Having assumed 
that the complained-of testimony was hearsay, and knowing that the statement 
referred to was the result of police interrogation, the admission of Billy's 
actual statement would have violated the appellant's confrontation rights. 
Billy's statement was not introduced in this case. Nonetheless, Prince's 
testimony in effect informed the jury of the general substance of Billy's 
statement and how it related to the appellant's statement such that Billy's 
statement was used against the appellant without giving him an opportunity to 
confront the declarant, Billy. Under these 
circumstances the appellant's confrontation rights were arguably violated. We 
will now determine whether the appellant was harmed by admission of the 
statement. Under Rule of Appellate Procedure 44.2(a), we must reverse the 
conviction unless we determine beyond a reasonable doubt that the error did not 
contribute to the jury's verdict. (28) 

The appellant 
claims that Prince's testimony harmed him because the central issue to the case, 
if not the sole issue, was whether the appellant had formed the intent to steal 
Walker's truck before he shot him. The appellant asserts that without the 
reference to Billy's statement, he was able to discredit Prince's testimony and 
undercut the statement in the appellant's own confession that he murdered Walker 
to steal his truck. We disagree with the appellant's assertion.
As seen in the 
above-quoted testimony, Prince testified that, after talking to Billy and the 
appellant, the authorities continued their investigation into the offense and 
"found additional property" and "located additional witnesses and people who may 
have had information." Although Prince gave no specific details about the 
"additional property and witnesses," he testified that none of this information 
was inconsistent with what the appellant had told him. Furthermore, the 
appellant stated in his confession that he stole the guns with which he shot 
Walker and took money out of Walker's pockets. A lighter and medicine bottles 
with the victim's name on them were also found in the appellant's possession. 

The appellant was 
indicted for committing capital murder by intentionally killing Walker while in 
the course of committing or attempting to commit robbery. Evidence is sufficient 
to support a capital murder conviction if it shows an intent to obtain or 
maintain control of property which was formed before or contemporaneously 
with the murder. 
(29) The only fact that the 
appellant attacks as fabricated is that he murdered Walker to steal his truck. 
However, the appellant was not indicted for stealing or attempting to steal a 
particular item from Walker. Further, the law does not require the State to 
allege the theft of a particular item, only to prove at trial that something was 
stolen, and that the intent to take it was formed before or contemporaneously 
with the murder. To prove its case of capital murder, the State was not required 
to prove that the appellant formed the intent to steal Walker's truck, or even 
that he took it at all. 
The appellant 
admitted in his statement that he took money and guns from Walker during the 
crime. Further, he does not attack these admissions or the fact that other 
property belonging to the victim was found in his possession. Because the theft 
of the truck was not necessary to prove capital murder, and because the jury 
could have inferred from this evidence that the appellant did form the intent to 
steal either before or contemporaneously with the murder, the appellant's 
conviction for capital murder is supported regardless of the lack of any 
pre-formed intent to steal Walker's truck. Thus, we hold that the admission of 
the testimony did not materially affect the jury's deliberations and was 
harmless beyond a reasonable doubt. (30) Points of 
error two and three are overruled. (31) 

In his seventh 
point of error, the appellant asserts that the trial court erred in excluding 
testimony in mitigation of punishment "regarding a history of family sexual 
abuse of multiple generations of children in [the appellant's] family." 
Specifically, the appellant claims that he was improperly prohibited from 
presenting testimony from his brother, Clifton Heath Shuffield; his uncle, 
Robert "Bobby" Shuffield; and his uncle's wife, Christine Shuffield. A summary 
of the testimony offered is necessary to resolve this point.
Clifton testified 
that he spent time with his uncle, Danny Shuffield, and at times they would 
smoke marijuana. When asked what else Clifton did with Danny, the State objected 
that such testimony was not relevant to the defendant in this case. Outside the 
presence of the jury, Clifton testified that Danny sexually abused him on a 
number of occasions, that Danny called Clifton before the appellant's trial 
began and told him not to testify about the molestation, that the appellant 
asked Clifton if he had been molested, and that the appellant told him that 
Danny had also molested him. The trial court sustained the State's objection and 
excluded the testimony. 
After the ruling, 
the appellant commented that he had another witness that he intended to call who 
would talk about the history of sexual abuse within the family. Still outside 
the jury's presence, the appellant then called his uncle, Robert, to the stand. 
Robert testified that he had three brothers, Danny; Billy, Sr., who was the 
appellant's father; and Jimmy. Robert testified that he and Billy were 
repeatedly molested by an "Uncle Burl," but he could not say whether Danny was 
ever molested. The State objected that the testimony was irrelevant and highly 
prejudicial. The court sustained the objection and excluded the 
testimony.
At the end of the 
day's testimony and after the court retired the jury for the evening, the 
appellant called Christine to the stand. Christine testified that she was 
married to Robert, that Robert told her that Danny had stated that the children 
would occasionally fondle him in his sleep, and that Robert threatened her if 
she testified in the appellant's trial. The appellant noted that he was offering 
this testimony only for the purpose of impeaching Robert's testimony that he had 
not had any such conversation with Christine. The trial court took the matter 
under advisement.
The next morning, 
the appellant urged the court to reconsider its ruling excluding the testimony 
of instances of sexual abuse in the appellant's family, "and also statements 
made by the defendant himself that he was abused by his Uncle Danny as a child." 
The State noted that it had no objection to testimony concerning the appellant's 
statements that he had been sexually abused. In fact, it pointed out testimony 
from other witnesses during which that very fact was admitted into evidence. 
However, the State did continue to object to any testimony about sexual abuse 
not suffered by the appellant himself. The trial court again sustained the 
objection and reiterated that testimony involving the sexual abuse of others was 
excluded. The trial court further ruled that the testimony from Christine that 
was offered for impeachment would also be excluded because it was simply a back 
door attempt to get the same inadmissible testimony into evidence.
An appellate 
court reviews a trial court's decision to admit or exclude evidence under an 
abuse of discretion standard. (32) 
If the trial 
court's decision was within the bounds of reasonable disagreement, the appellate 
court should not disturb its ruling. 
(33)
Texas Rule of 
Evidence 401 defines relevant evidence as "evidence having any tendency to make 
the existence of any fact that is of consequence to the determination of the 
action more probable or less probable than it would be without the evidence." 
Furthermore, except as otherwise provided by statute or rule, a jury is entitled 
to have before it "all possible relevant information about the individual 
defendant whose fate it must determine." (34) 
Even when the 
evidence is relevant, the trial court may be within its discretion to exclude it 
pursuant Texas Rule of Evidence 403. Under Rule 403, relevant evidence may be 
excluded if "its probative value is substantially outweighed by the danger of 
unfair prejudice, confusion of the issues, or misleading the jury, or by 
considerations of undue delay, or needless presentation of cumulative 
evidence."
The fact that 
others in the appellant's family were abused does not by itself make the 
appellant more or less morally culpable for the crime for which he was on trial. 
Nor does it, by itself, make a jury's finding of mitigation any more or less 
probable than it would be without the evidence. (35) 
Evidence that 
the appellant himself was sexually abused is relevant and probative when a jury 
is considering evidence in mitigation of the death penalty. However, the State 
made clear that, not only did it not object to this type of evidence, the 
substance of the relevant evidence came in through other witnesses. Looking at 
the entirety of the record, we cannot say that the trial court abused its 
discretion in excluding the complained-of testimony. Point of error seven is 
overruled. 
We affirm the 
judgment of the trial court. 
Delivered: 
February 15, 2006
Publish 
1. Tex. Penal Code § 19.03(a). 
2. Tex. Code Crim. Proc. Art. 37.071, § 2(g). 
3. Tex. Code Crim. Proc. Art. 37.071, § 2(h). 
4. Tex. Code Crim. Proc. 
Art. 35.261; See Batson v. 
Kentucky, 476 U.S. 79 (1986). 
5. Shuffield v. State, No. AP-74,574 (Tex. Crim. 
App. Apr. 27, 2005) (not designated for publication). 
6. Simpson v. State, 119 S.W.3d 262, 268 (Tex. 
Crim. App. 2003). 
7. Ibid. 
8. Ibid. 
9. Ibid.; see also Johnson v. State, 68 
S.W.3d 644, 649 (Tex. Crim. App. 2002). 
10. 514 U.S. 765, 768 (1995); see also Simpson, 
119 S.W.3d at 268. 
11. Mays v. State, 726 S.W.2d 937, 950 (Tex. Crim. 
App. 1986); see also Tex. R. App. P. 33.1. 
12. Tex. R. Evid. 401- 403. 
13. Williams v. State, 958 S.W.2d 186, 195 (Tex. 
Crim. App. 1997). 
14. Williams, 958 S.W.2d at 196. 
15. Montgomery v. State, 810 S.W.2d 372, 389-90 
(Tex. Crim. App. 1991) (Op. on Reh'g). 
16. Santellan v. 
State, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) (quoting the plurality 
opinion in Rachal v. State, 
917 S.W.2d 799, 808 (Tex. Crim. App. 1996), and citing Montgomery v. 
State, 810 S.W.2d 372, 392 (Tex. Crim. App. 1990)). 
17. Narvaiz v. State, 
840 S.W.2d 415, 429 (Tex. Crim. App. 1992). 
18. Heitman v. State, 
815 S.W.2d 681, 690 (Tex. Crim. App. 1991). 
19. Miranda v. 
Arizona, 384 U.S. 436 (1966). 
20. This is the specific statement about which the 
appellant complains on appeal. 
21. Tex. R. Evid. 801(d). 
22. Tex. R. Evid. 802. 
23. Whether the hearsay was admissible under an exception 
or not is immaterial given our resolution of the appellant's confrontation 
point. See Tex. R. Evid. 
803; Tex. R. App. P. 44.2(b). 
24. U.S. Const. Amend. 6; Pointer v. Texas, 
380 U.S. 400 (1965) (applying Sixth Amendment to the States). 
25. Ohio v. Roberts, 
448 U.S. 56, 63 (1980). 
26. 541 U.S. 36, 68 (2004) 
27. Ibid. 
28. Tex. R. App. P. 44.2(a). 
29. Garrett v. State, 
851 S.W.2d 853, 856 (Tex. Crim. App. 1993). 
30. Tex. R. App. P. 44.2(a). 
31. Because we conclude that the admission of Billy's 
statement was harmless beyond a reasonable doubt under the stricter 
constitutional standard in Rule of Appellate Procedure 44.2(a), we need not 
address whether the trial court erred in admitting the statement over the 
appellant's hearsay objection. 
32. Rachal v. State, 
917 S.W.2d 799, 816 (Tex. Crim. App. 1996). 
33. Ibid. 
34. Sells v. State, 
121 S.W.3d 748, 766 (Tex. Crim. App. 2003). 
35. See Tennard v. 
Dretke, 542 U.S. 274 (2004) (holding that the 
meaning of relevance in the context of mitigating evidence introduced in a 
capital sentencing proceeding is no different than in any other context, and 
thus the general evidentiary standard of "any tendency to make the existence of 
any fact that is of consequence to the determination of the action more probable 
or less probable than it would be without the evidence" applies).